1  STEPHEN I. GASSNER, CSB 176557
2  GASSNER & GASSNER, APC
   9121 Haven Avenue, Suite 260
3  Rancho Cucamonga, California 91730
   T: (909) 937-7000    F: (909) 481-1561
4
5  Attorney for Plaintiff,
   KURT MACCARLEY

*Given Dismissal by Does*

6
7
8
9

## UNITED STATES FEDERAL DISTRICT COURT,

## CENTRAL DISTRICT OF THE STATE OF CALIFORNIA

10
11

**CV09-04677 GW (RCx)**

| | |
|---|---|
| KURT MACCARLEY, | ) CASE NO. _____ |
| Plaintiff, | ) |
| vs. | ) COMPLAINT FOR: |
| | ) 1. RACKETEERING |
| COUNTRYWIDE; LANDSAFE; BANK | ) 2. CIVIL CONSPIRACY |
| OF AMERICA, ANGELO MOZILO; | ) 3. AIDING AND ABETTING |
| JOSEPH MICHAEL MAGALDI, III,; and | ) 4. DECLARATORY AND INJUNCTIVE |
| DOES 1 through 100, Inclusive. | ) RELIEF |
| | ) 5. CALIFORNIA BUSINESS AND |
| Defendants. | ) PROFESSIONS CODE §17200 [UNFAIR |
| | ) COMPETITION] |
| | ) 6. CALIFORNIA BUSINESS AND |
| | ) PROFESSIONS CODE §17500 [FALSE |
| | ) ADVERTISING] |
| | ) 7. UNJUST ENRICHMENT |
| | ) 8. VIOLATION OF THE TRUTH IN |
| | ) LENDING ACT |
| | ) 9. VIOLATION OF HAWAII CONSUMER |
| | ) PROTECTION LAWS, HRS 476-2 |
| | ) 10. APPRAISAL FRAUD; ANTI-TRUST |
| | ) PER CLAYTON ACT; PLAIN OLD |
| | ) FRAUD |
| | ) 11. BREACH OF CONTRACT; BREACH |
| | ) OF THE IMPLIED COVENANT OF |
| | ) GOOD FAITH AND FAIR DEALING; |
| | ) INTENTIONAL INFLICTION OF |
| | ) GREAT EMOTIONAL DISTRESS |
| | ) 12. COLLECTION OF UNLAWFUL DEBT |

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                        CASE NO.:

1

1)   Introduction (FRCP §8a) ........................................................................ 4
     a)   NATURE OF THE CASE ............................................................... 5

2)   JURISDICTION AND VENUE ......................................................... 8

3)   PARTIES .......................................................................................... 10

4)   Summary of Facts ........................................................................... 14

5)   COUNTRYWIDE'S NETWORK OF BROKERS ........................... 18
     b)   Countrywide's Standardized Misrepresentations ....................... 19
     c)   Countrywide's Inducement of Brokers To Direct Borrowers ("Steering
          them") Towards Subprime Loans ................................................ 21
     d)   Subprime Loans were More Lucrative to Countrywide than Prime Loans ........... 23
     e)   Countrywide was Lending to Borrowers Who Could not Afford the
          Payments; making a loan into an illusory INVESTMENT rather than a
          vehicle for facilitating housing. ................................................. 25
     f)   COUNTRYWIDE WAS A COMPENDIUM OF CONSPIRACIES ................... 26
     g)   COUNTRYWIDE WAS A RACKETEERING INFLUENCED AND
          CORRUPT ORGANIZATION, WHOSE PURPOSE WAS TO ENGAGE
          IN "HOME EQUITY FRAUD" BY FALSELY CONVINCING
          HOMEOWNERS THAT THEY WERE OPRERATING TO THE
          HOMEOWNERS' BENEFIT ......................................................... 27
          i)    Despite legal independence between Countrywide and its many co-
                conspirators, there was one actual Enterprise ............................ 27
          ii)   PREDICATE ACTS ........................................................... 28
          iii)  VIOLATIONS OF 18 U.S.C. §1341 and 18 U.S.C. §1343 ................ 29
          iv)   PATTERN OF RACKETEERING ACTIVITY ............................. 30
          v)    RACKETEERING VIOLATIONS ........................................... 31
     h)   FRAUDULENT CONCEALMENT ............................................. 32

6)   COUNT I ......................................................................................... 36
     i)    RACKETEERING - 18 U.S.C. § 1962(D) BY CONSPIRING TO
           VIOLATE 18 U.S.C. § 1962(A) AND (C);  AGAINST ALL
           DEFENDANTS ................................................................... 36

7)   COUNT II ........................................................................................ 37
     i)    CIVIL CONSPIRACY IN THE VIOLATION OF 18 U.S.C. §
           1962(A) AND (C); AGAINST ALL DEFENDANTS ........................ 37

8)   COUNT III ....................................................................................... 38

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                    CASE NO.:

2

j)   AIDING AND ABETTING; ACTIONS VIOLATING THE RICO ACT 18
U.S.C. § 1962(A) AND (C).................................................................... 38

9)   COUNT IV ................................................................................................ 39
k)   DECLARATORY AND INJUNCTIVE RELIEF UNDER 18 U.S.C.
§1964(A) AGAINST BANK OF AMERICA AND LANDSAFE...................... 39

10)  COUNT V .................................................................................................. 40
l)   VIOLATION OF THE CALIFORNIA UCL-BUSINESS & PROFESSIONS
CODE §17200, ET SEQ.......................................................................... 40

11)  COUNT VI ................................................................................................ 41
m)   VIOLATION OF THE CALIFORNIA FAL, BUSINESS AND
PROFESSIONS CODE §17500, ET SEQ ................................................. 41

12)  COUNT VII ............................................................................................... 42
n)   UNJUST ENRICHMENT ....................................................................... 42

13)  COUNT VIII............................................................................................... 43
o)   VIOLATION OF THE TRUTH IN LENDING ACT AND FOR
RECUOPEMENT AGAINST ALL DEFENDANTS ..................................... 43

14)  COUNT IX ................................................................................................ 45
p)   HAWAII CONSUMER PROTECTION HRS 476-2 AGAINST ALL
DEFENDANTS.................................................................................... 45

15)  COUNT X .................................................................................................. 45
q)   APPRAISAL FRAUD, ANTITRUST AND FRAUD AGAINST ALL
DEFENDANTS.................................................................................... 45

16)  COUNT XI. ............................................................................................... 48
r)   BREACH OF CONTRACT, WARRANTY OF GOOD FAITH AND FAIR
DEALINGS AND INFLICTION OF EMOTIONAL INJURY AGAINST
ALL DEFENDANTS ............................................................................ 48

17)  Count XII.................................................................................................. 49
s)   Collection of an Unlawful Debt Against all Defendants ......................... 49

18)  PRAYER FOR RELIEF .............................................................................. 49

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,        COMPLAINT        CASE NO.:

3

1   19)   RIGHT TO AMEND ...................................................................................... 50

2

3   20)   JURY DEMAND ........................................................................................... 51

4

5   21)   CERTIFICATION OF COUNSEL.................................................................. 51

6   22)   Verification.................................................................................................... 51

7

8   **PLAINTIFF, KURT MACCARLEY, alleges as follows:**

9

10  **1)      Introduction (FRCP §8a)**

11       1.      Plaintiff, KURT MACCARLEY (hereinafter "Plaintiff"), is, and at all times herein

12  mentioned, was an individual and homeowner, and a resident of the State of California.  He

13  received and responded to advertising from Defendant Countrywide Home Loans, Inc.,

14  (hereinafter "Countrywide"), helping him to build his "Dream Home" in out-of-state Hawaii.

15

16  Countrywide and its agents took over $101,000 from MacCarley, using a "On-Time-Close"

17  scheme to fund Three Loans with One Application, based upon false inducements, including

18  appraisal fraud.  Countrywide, its successor, Bank of America, its collaborating sub-entity,

19  LandSafe, Inc., Landsafe Appraisal Service, Inc., and its top performing loan solicitor, Joseph

20  Michael Magaldi, III, are liable for treble damages pursuant to the Racketeer Influenced and

21  Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., statutory damages pursuant to

22

23  Truth in Lending Act (TILA), 16 U.S.C. §1601 ET. Seq., California law, punitive damages

24  California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL"), the False

25  Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq. ("FAL"), Hawaii Consumer Protection

26  HRS 476-2, and plain old fraud under the Pendent Jurisdiction of this court.  Plaintiff furthermore

27

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

1   seeks declaratory and injunctive relief to end those practices and prevent further losses to the

2   Plaintiff, and to save some portion of his investment from destruction, and to enjoin foreclosure.

3

4   ## a) NATURE OF THE CASE

5

6   2.      Defendants established a trust or combination of conspiraing firms, and engaged in

7   a fraudulent scheme and artifice to systematically lure the Plaintiff to enter into a "subprime"

8   mortgage and loan, such loans were offered with higher interest rates and additional costs than

9
    "prime" loans, which are generally available at competitive costs to borrowers who are considered
10
    to be good credit risks, such as the Plaintiff herein, who had credit excellent scores of 741, 783 and
11
12  791- through a variety of fraudulent means, for the sole purpose of maximizing Defendants' own

13  profitability and without any regard for the breathtakingly adversefinancial consequences to the

14  Plaintiff. The benefits of the transaction were deliberately overstated.

15
    3.      Defendants used a remarkeably well-developed sequences of false representations
16
17  to Plaintiff, that they were offering the best loans available to the Plaintiff when, in fact, they were

18  marketing one of the most expensive loan products.

19
    4.      Countrywide and its agents actually had a policy and practice of steering prime
20
    borrowers into subprime loans that were calculated to destroy the consumer's net worth.
21

22  5.      Countrywide trained its authorized brokers to direct borrowers into subprime loans

23  even when borrowers were qualified for loans on far more favorable terms. For example, it showed

24  the movie "Boiler Room" (a depiction of a dishonest brokerage house) to its loan initiators and

25  underwriters, during business hours, on its premises.

26

27

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                    CASE NO.:

6. Countrywide targeted borrowers who were identifiable credit risks, or at rates and loan amounts beyond the borrowers' means for repayment .

7. Countrywide did so because subprime loans were profitable than prime loans, which have more favorable terms for eligible borrowers, notwithstanding the adverse effects that they had upon consumers and their communities.

8. 1. Countrywide's subprime loans also contain undisclosed fees and penalties that produce significant amounts of revenue to Countrywide.

9. By steering borrowers into subprime loans, Countrywide would earn additional funds that were not disclosed to borrowers.

10. Countrywide established a practice selling such loans on the secondary market, based upon false loan initiation documents. That meant that Countrywide sold its ability to mitigate the losses that it caused, when borrowers, including the Plaintiff fell foreseeably, into default. It also meant that Countrywide induced its agents, including Joe Magaldi, to insert falsehoods into loan initiation documents, including those of the Plaintiff

11. Loan Defaults caused by lender fraud are, per se, not-foreclosable. Such a rule, as a bright-line test, is necessary to break the trust or combination, hold lenders who engage in fraud liable both to investors and borrowers alike, and to further the policy of law to encourage honest transactions.

12. Knowingly selling the risk of liability for fraud is prima facie evidence of fraud and fraud per se. The perpetrators are liable for the economic loss perpetrated on each side of the transaction.

9. Countrywide and its firms, established a widespread artifice to issue loans that were

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,     COMPLAINT          CASE NO.:

6

entirely inappropriate for the borrower. As a consequence, a significant percentage of borrowers from Countrywide, including the Plaintiff, have defaulted or are in default on their loans.

13. Even as to borrowers who have not defaulted on their loans, a huge percentage is in danger of doing so. Countrywide in its corporate filings, as of June 30, 2007, stated that approximately one quarter of all subprime loans serviced by Countrywide had been delinquent. Countrywide proximately caused this situation by engaging in fraudulent lending practices. The lending practices of the ONE TIME CLOSING program were a particularly fraudulent practice, because they lured borrowers such as the plaintiff into over-leveraging their assets to a point of toppling into bankruptcy, for benefit of COuntrywide. The OTC program was one of Countrywide's most lucrative loan programs. As a result, however, the Plaintiff and many other Countrywide borrowers, had their fortunes and borrowing capacity destroyed.

14. Loan initiation documents from the OTC program at Countrywide were deliberately deceptive, incomprehensible, and omitted key documents that the customer could not inspect until the day of signing loan documents. Plaintiff got no opportunity to inspect all of the riders to the promissory note until the day of signing documents.

15. It was a standard practice to rush borrowers, including the plaintiff, through the process of signing documents on the day of closing. Such practice was calculated to deliberately conceal key terms of the loan, including its true costs, from the borrower until it was too late for the borrower to reverse the transaction. By immediately securitizing loans, including the plaintiff's loans, Countrywide sought to finalize its profits and limit the borrowers' recourse.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                    COMPLAINT                    CASE NO.:

7

16.     Plaintiff only recently learned that Countrywide had a policy of giving kickbacks to the Real Estate Agent, Loan Solicitor, Loan Officer, Loan Underwriter, the Kona Office of Countrywide, and its own officers and directors, including Angelo Mozilo.

17.     Deliberate and repeated violations of the Truth in Lending Act constitute fraud per se, justifying imposition of punitive damages against each of the perpetrators who knew (or had a duty to know) that their actions violated Federal Law.

18.     The Plaintiff was induced into taking an unreasonable, fraudulent, and predatory loan. The loan proximately caused the destruction of Plaintiff's borrowing power, his savings and investments for retirement. He qualified for far loans, and did not actually need a loan at all.

19.     Plaintiff who entered into a loan that he clearly cannot afford is placed in the precarious situation wherein he has to forgo other financial obligations in order to meet the ever-increasing burden of this high-interest loan; though the true costs were never disclosed to him.

20.     Moreover, the Plaintiff has incurred significant prepayment penalties when he seeks to refinance his mortgage at a more favorable rate, defaults on the loan, loss of the home, destruction of his credit, bankruptcy, or financial ruin.

21.     Countrywide's business practices constituting fraud and violation of State and Federal lending laws, persisted from at least 2001 to 2007, and caused the Plaintiff's damages.

## 2)      JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962 and 1964; 28 U.S.C. §§1331, 1332 and 1367, 15 U.S.C. §15, 15 U.S.C. §1640(e). This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§1965(b) and (d).

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

8

23.     This court has subject matter jurisdiction over the claims arising under the laws of the State of California, under its Pendent Jurisdiction. It is appropriate to apply the California UCL and FAL to protect the Plaintiff because the events giving rise to relief occurred in significant part in California.

24.     Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §1391(b), 15 U.S.C. §22   , and 28 U.S.C. §1391 because some of the Defendants are domiciled, here, routinely transact business within this judicial district, conduct the interstate trade in this Judicial District, and purposely avail themselves of the laws of the State of California in manners described below in substantial part within this district. Moreover, the contracts at issue were brought from Hawaii to California by Joseph Magaldi III and were signed here.

25.     Countrywide was predominantly domiciled within this jurisdiction at the time when the complaint-of wrongs occurred.

26.     The events depicted herein affected the flow of interstate commerce.

27.     The transactions described herein were made in interstate commerce.

28.     Defendant Magaldi deliberately traveled from Hawaii to California, to sell Hawaii property to the Plaintiff who was a California resident; and the subject loan documents were signed in this judicial district.

29.     Advertising to induce the Plaintiff into the subject transactions was transmitted to the Plaintiff in interstate commerce.

30.     Defendant Countrywide, through its ONE TIME CLOSING office, induced and initiated interstate telephone calls, to induce the Plaintiff to enter into the subject transactions.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

9

31.     Defendant Countrywide is and was a corrupt organization subject to Federal Regulation.

32.     On information and belief, this is the most convenient venue for the for the convenience of parties and witnesses that will promote the just and efficient conduct of this action.

33.     Each defendant has an agent who either resides in or conducts transactions in this judicial district.  15 U.S.C. § 15(a).

34.     The Plaintiff represents a narrow sector of the economy which is endangered by a breakdown of competitive conditions, which occurred when Countrywide participated in selling Interstate "Dream Homes" for construction and occupancy in a place far away from the purchaser.

35.     Acceptance of this judicial district would further the interests of justice.

36.     This court has jurisdiction over the Antitrust claim (and Plaintiff has standing) pursuant to 15 U.S.C. 15(a) of the Clayton Antitrust Act.

## 3)     PARTIES

37.     Plaintiff Kurt P. MacCarley ("Plaintiff" or "MacCarley") is a homeowner and borrower.  He resides part-time at 19-4034 Old Volcano Road, Volcano, HI 96785 and 4470 Sunset Blve., #794, Los Angeles CA 90026.  Plaintiff was a target of the Defendants' racketeering activity.

38.     Defendant Countrywide Financial Corp. ("Countrywide Financial") is a Delaware corporation headquartered at 4500 Park Granada, Calabasas, California. Countrywide Financial is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                    CASE NO.:

10

39.     Defendant Countrywide Bank, F.S.B. ("Countrywide Bank") is a national banking association headquartered at 1199 North Fairfax Street, Suite 500, Alexandria, Virginia 22314. Countrywide Bank is and was a subsidiary of Countrywide Financial, and funds loans for Countrywide Financial's mortgage banking segment.

40.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA 91302. Countrywide Home Loans, Inc.  is and was a subsidiary of Countrywide Financial, and engages in the business of originating mortgage loans.

41.     Defendant Countrywide Tax Services Corp. ("Countrywide Tax") is a California corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA 91302. Countrywide Tax is and was a subsidiary of Countrywide Financial, and provides tax services in connection  with mortgage loan closings.

42.     Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA 91302. LandSafe is and was a subsidiary of Countrywide Financial, and provides loan closing products and services such as credit reports, appraisals, property valuation services and flood determinations.

43.     Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a California corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA 91302. LandSafe Appraisal is and was a co-conspirator of Countrywide Financial, and offers appraisal services in connection with mortgage loan closings.

44.     Defendant LandSafe Credit, Inc. ("LandSafe Credit") is a California corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA 23 91302. LandSafe Credit is and was a

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,               COMPLAINT                    CASE NO.:

11

1    subsidiary of Countrywide Financial, and provides credit reports in connection with mortgage loan

2    closings.

3

4        45.    Defendant LandSafe Flood Determination, Inc. ("LandSafe Flood") is a California

5    corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA 91302. LandSafe Flood is

6    and was a subsidiary of Countrywide Financial, and provides flood determination services in

7    connection with mortgage loan closings.

8

9        46.    Defendant Bank of America, (hereinafter "BOA") is a Delaware Corporation,

10   headquartered **at 100 N. Tyron Street, Charlotte, NC 28255** At all times relevant hereto

11   Defendant Bank of America was an assignee, who owned and/or purchased the benefits of

12   Plaintiff's residential mortgage loan from Countrywide Home Loans, Inc., and has borrowed $45

13   Billion of public money to sustain its losses derived in part from this sale.

14

15       47.    Defendant, JOSEPH MICHAEL MAGALDI, (herinafter, "MAGALDI" or

16   "Broker"), is an individual who claimed to be a loan broker when in reality, he was operating

17   under his father's JOSEPH MIGALDI, JR.'s, (hereinafter, "MAGALDI 3") loan brokerage license.

18   Joseph M. Magaldi, III is and was a Real Estate Agent of Countrywide. As an agent for

19   Countrywide, each transacts business as an alter-ego for the other. MAGALDI 3, worked for

20   Plaintiff as a Real Estate Agent in California, while submitting loans to Countrwide in Hawaii,

21   soemtimes impersonating his father, and somethimes througha a shell corporation. Countrywide

22   knew, acknowlleedged and deliberately ratified Magaldi 3's many conflicts of interests, and shared

23   in the benefits. He was doing business in the State of California when he entered into the

24   challenged loan transactions. Countrywide is a Corporation that routinely does business in the

25   State of California, and in the County of Los Angeles. Plaintiff is and informed and believes, and

26   based thereon alleges, that at all times herein Joseph Michael Magaldi, III, resided at 19-4558

27

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                    CASE NO.:

Amaumau Road, Volcano, Hawaii 96785. On information and belief, Defendant Magaldi a fugitive, wanted by the FBI. On information and belief, Magaldi left the United States and last resided in Vietnam. On information and belief, there is an All Points Bulletin in the State of Hawaii for Joseph Michael Magaldi, III, for actions pertaining to this sequence of loans. Magaldi converted Plaintiff's construction money (loan proceeds) to his own use and left the United States without accounting for it.   Said conversion and fraud are subject to a different lawsuit now pending in Hawaii State Court.

48.     Between 2005 and 2006, Countrywide demanded that Magaldi resign his Real Estate License or else forefeit his practice of submitting loans to Countrywide.  Magaldi refused. Countrywide nevertheless continued to accept Magaldi's loan submissions, notwithstanding its knowledge of Magaldi's conflict of interests. Said conflict of interest for Magaldi was "not uncommon" for Countrywide, and was widespread, though illegal and deceptive.

49.     In or about, April 2006, Plaintiff received an advertisement from Defendant Countrywide,  that advertised " Introducing a dream loan to help you build your dream home". This advertisement was for Countrywide's One-Time Close Loan ("OTC") program that offered both construction and permanent financing, in one fast and easy transaction.  OTC's top "selling point" was that borrowers could even declare bankruptcy during construction, without losing their home. The program was designed specifically to confuse borrwers by disclosing finance terms that made no sense (and did not add up) and concealing the true costs of the transaction until well after borrowers had invested significant sums of their own money and effort into the process of constructing a new "dream home."

50.     Countrywide Employees involved in its OTC program knew that their conduct was illegal. Warned that 100% of their telephone calls were recorded by Countrywide (a program

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                    COMPLAINT                    CASE NO.:

13

known by its acronym "N.I.C.E."), workers handling OTC matters routinely communicated with loan solicitors first by cell-phone and then by company provided desk telephones. The company phone was recorded, and the cell-phone was not. Deals were discussed by cell, and restated by land-ilne telephone, *as if* stated for the first time.

51.    The term "Countrywide" as used herein refers to any and all affiliated business entities bearing the name "Countrywide", including but not limited to those listed here, regardless of wheresoever situated, and regardless of the form of ownership.

52.    The term "LandSafe" as used herein refers to any and all affiliated business entities bearing the name "LandSafe", including but not limited to those listed here, regardless of wheresoever situated, and regardless of the form of ownership.

53.    Angelo Mozilo is and was the chief officer of "Countrywide" who controlled the operations of the corporation and its compendium of interrelated business entities, and who bears personal responsibility for the wrongful acts alleged herein that caused harm to the Plaintiff. Mozilo realized and drew excessive executive compensation between the years 2001 and 2007 resulting from wrongful acts alleged herein, some of which proximately, foreseeably, directly, or intentionally harmed the plaintiff, to the extent of proof. Mozilo and whomever received any payments of money that was received by him during the subject timeframe, is personally responsible to pay all damages awarded against any other defendant set forth herein.

## 4)    Summary of Facts

54.    On or about April 16th, 2008, Plaintiff borrowed money upon a subprime loan, Loan No: 180805561, as a refinance of his primary dwelling in the form of an interest-only adjustable-rate mortgage, Loan No.: 136879784, and a home equity line of credit, Loan No:

---

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,            COMPLAINT            CASE NO.:

14

1   136880432, and Equity Line Number: 800-669-6607, from Countrywide Home Loans, Inc. and

2   Countrywide Bank, F.S.B., respectively. Plaintiff's initial monthly payments during the first ten

3   years of the mortgage loan are interest-only at a fixed-interest rate, until 2011, when an adjustable

4   interest rate will go into effect, and Plaintiff will be required to make payments on the principal of

5   the loan as well. Plaintiff's home equity line of credit provides for an interest rate that adjusts each

6   month following the first monthly payment. In connection with the closing on Plaintiff's home, he

7   also paid certain fees to subsidiaries of Countrywide Financial which exceeded those charged by

8   other lenders, including an appraisal fee, credit report fee, discount fees, broker's fees, tax service

9   fee, flood certification fee, and excessive fees for courier/express mail services. In fact, the broker

10  real estate agent came to California to close the loan.

11  55.     April 22nd, 2008, Plaintiff borrowed money upon a subprime loan, as a refinance of

12

13  his primary dwelling in California, in the form of an interest-only adjustable-rate mortgage,

14  Countrywide Home Loans, Inc. and Countrywide Bank, F.S.B., respectively. Plaintiff's initial

15  monthly payments during the first ten years of the mortgage loan are interest-only at a fixed-

16  interest rate, until 2011, when an adjustable interest rate will go into effect, and Plaintiff will be

17  required to make payments on the principal of the loan as well. If the allegation sounds

18

19  incomprenensible, it is because the loan papers are incomprehensible. Plaintiff's home equity line

20  of credit provides for an interest rate that adjusts each month following the first monthly payment.

21  Inconnection with the closing on Plaintiff's home, he also paid certain fees to subsidiaries of

22  Countrywide Financial which exceeded those charged by other lenders, including an appraisal fee,

23  credit report fee, discount fees, broker's fees, tax service fee, flood certification fee, and excessive

24  fees for courier/express mail services. In fact, the broker real estate agent came to California to

25  close the loan.

26

27

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,        COMPLAINT        CASE NO.:

15

56.     Between 2001 and 2007, Countrywide and its agents artificially inflated the prices of real estate loans for "dream houses" sold in interstate commerce. Said manipulations constituted a material or substantial cause of the Plaintiff's damages, by inflating the price to such an extent that Countrywide would benefit from the property as an INVESTMENT, rather than as a LENDER.

57.     Countrywide's purpose in inflating appraised values of real estate, was to trick investors into providing funding for loans, and then lending money to borrowers situated as the Plaintiff was, while taking percentages of the transaction demarked as costs for services that were never actually provided.  The higher the price, then the greater the remuneration for Countrywide and its numerous affiliates who participated in the transactions.

58.     As a result of Defendants¹ fraudulent scheme, and Plaintiff's reasonable reliance on Defendants' fraudulent misrepresentations, Plaintiff has been injured in a variety of ways. Borrowers who are induced into taking out subprime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of having to pay much higher interest rates than they would otherwise pay on loans, which also sometimes leads to significant prepayment penalties when they seek to refinance their mortgage at a more favorable rate. Borrowers who enter into loans for which they are not qualified and which they cannot afford, which are offered with the promise that such loans will improve their financial well-being, have been injured through the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to significant prepayment penalties when they seek to refinance their mortgages at a more favorable rate, defaults on their loans, losses of their homes, destruction of their credit, bankruptcy, or financial ruin.

Gossner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

16

59.     Defendants' scheme was created in order to induce as many borrowers as possible into expensive and dangerous subprime loans, because such loans are the most lucrative for Countrywide in a number of ways. The Broker Defendants gain from the scheme because of valuable incentives that Countrywide pays to the Broker Defendants to direct borrowers into the subprime loans.

60.     Senior Management at Countrywide had knowledge that its loan activities in the ONE TIME CLOSING department were unlawful, fraudulent, deceitful, and constituted the practice of unlawfully tying the sale of several products at high prices, to the sale of other products to which it had monopoly power; insofar as that Countrywide owned approximately 25% of the residential loan market at the time.  To mitigate its risk of detection and indictment for Federal Crimes, Countrywide and its senior management engaged in the deliberate concealment of this entity from Federal Regulators and even its purchaser, Bank of America.  Said entity was among the most profitable at Countrywide when the subject loans were initiated.

61.     Statement of Damages.  There are damages that are clear and definite, i.e. the Plaintiff's downpayment, costs and fees that were inappropriately charged to the Plaintiff, and 100% return of the interest that was charged to the plaintiff in compensation for the three loans. These damages will be proved at time of trial.  There are additional damages sustained as a consequence of the Defendants' wrongful actions, such as the loss of property used to fund the loans (which itself resulted in the creation of a predatory loan), and lost propety invested in reasonable reliance upon the representations, which is less clear and less specific, but still can be proved at time of trial.  Discovery and accounting are ongoing, and this Plaintiff reserves the right to account for the actual damages that were caused.

---

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                CASE NO.:

62.     The Plaintiff's damages were foreseeable and foreseen by each of the Defendants; and the Defendants' conduct directly caused Plaintiff's damages.

63.     Each defendant is and was an agent of the other.  Each defendant had knowledge of the activities of the other defendant.  Each defendant knew and was responsible to know that its actions were illegal and oppressive to the Plaintiff.  Each Defendant conceald its actions and the actions of its co-conspirators from the Plaintiff.

## 5)     COUNTRYWIDE'S **NETWORK OF BROKERS**

64.     Countrywide had many such brokers in Magaldi's position – who maintained the appearance of independence, but who were not independent, who created confidential fiduciary relationships with Countrywide Borrowers such as the plaintiff, but actually operated for their own purposes that were aligned with Countrywide's, who said they were attempting to sell the best loan possible to Countrywide's customers, but who instead placed Countrywide's customers on the mathematically determined path to financial ruin.

65.     Countrywide was one of the largest mortgage-lending companies in the United States. Countrywide publicly promoted its home financing expertise by means of nationwide advertising campaigns, and through telemarketing.  It trained, authorized and consented to its agents marketing its products.  In its advertisements and telemarketing, Countrywide solicited persons to apply for financing with Countrywide either in one of its offices or through one of the mortgage brokers who Countrywide authorized to accept applications on its behalf, including in the State of California and Hawaii.

66.     Countrywide also made home-mortgage loans that are arranged by its network of independent mortgage brokers. Countrywide's mortgage brokers were trained to induce borrowers

---

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                    CASE NO.:

to enter into loans via telemarketing and other sales efforts that are carefully directed by Countrywide, such as was done in this case. Those loans are made in reliance on Countrywide's credit-granting policies and with the participation of Countrywide.

67.     As described below, Countrywide and its network of authorized brokers together engaged in a common scheme to direct ("steer") borrowers into subprime mortgages that they could not actually afford, purely for the benefit of Defendants, at the Plaintiffs expense.  This plaintiff and many similarly situated borrowers, lost most of their life's savings due to the common efforts of Countrywide and its "independent" brokers.

### b) *Countrywide's Standardized Misrepresentations*

68.     Plaintiff reiterates paragraph 64 above (see page on page 18).

69.     Countrywide taught their agents to systematically make standardized misrepresentations to draw unsuspecting homeowners, such as the Plaintiff, into subprime loans. For example, Brokers and sales persons working for Countrywide used standardized sales scripts, originated by Countrywide, in their sales pitches to unsophisticatd prospective residential borrowers.  Said scripts were deliberatley misleading, calculated and tricked borrowers into entering into complex transactions that no ordinary person could understand.originated within the Countrywide organizations, and were deliberately developed for purposes of selling predatory loans to unsuspecting homeowners such as the Plaintiff, in manners calculated to transfer the borrowers' home equity to Countrywide.

70.     Countrywide encouraged its sales force to solicit customers over the telephone with standardized sales pitchs that were false.  For instance, a common phrase uttered by Countrywide brokers and independent brokers who sold Countrywide loans, was "I want to be sure you are

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                    COMPLAINT                    CASE NO.:

19

1    getting the best loan possible."   But in point of fact, said brokers actually intended to sell loans

2    that maximized their own personal wealth, and in utter disregard of the borrower's ability to repay

3    the loan.

4

5        71.    This sales pitch was reinforced on Countrywide's website regarding home purchase

6    loans, where the potential borrower is falsely assured that "Countrywide can help you obtain the

7    best possible rate ... Said representation was posted on Countrywide's website at

8    http://www.countrywide.comlpurchase/rtoday.asp".

9

10       72.    Members of Countrywide's sales force are  and were required to adhere to the

11   carefully prepared scripts in their telemarketing efforts. First, in order to lull customers into

12   believing that the sales representative is their friend and working on their behalf, sales

13   representatives are instructed in their sales manual to build rapport with the client by finding

14   "points of common interest." These scripts also set forth aggressive techniques for persuading

15   homeowners to falsely believe that they can afford to take on loans. For example, one marketing

16   manual provided a script in which marketers were instructed, if a homeowner indicated that their

17   mortgage was already paid off, to try to push a home equity loan. The script provided verbatim

18

19   lines to be used in such sales pitches, including "Don't you want the equity in your home to work

20   for you?" and "You can use your equity for your advantage and pay bills or get cash out. How does

21   that sound?"  Said representations were materially misleading.

22

23       73.    However, rather than offering borrowers the "best loan possible," Defendants'

24   scheme was designed to maneuver as many borrowers, such as the Plaintiff, as possible into high-

25   cost subprime loans, irrespective of whether the Plaintiff qualified for a loan on better terms, or

26   whether the any responsible loan underwriter could qualify the borrower for any loan at all.

27   Moreover, rather than offering a loan that worked to the Plaintiffs advantage, the loan worked to

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

20

1   the advantage of Countrywide, and injured Plaintiff, by reducing his net worth and unreasonably

2   increasing his exposure to market risk.   To accomplish that, Countrywide would gain the

3   undeserved trust of the borrower, and then produce incomprehensible loan papers on false

4   pretenses, that created undisclosed costs of said loans.

5

6

7   ### c) *Countrywide's Inducement of Brokers To Direct Borrowers ("Steering them") Towards Subprime Loans*

8   74.   At the same time that the Countrywide sales force was promising customers to get

9   them "the best loan possible," and unbeknownst to the Plaintiff, Countrywide's brokers and sales

10   representatives are being rewarded for making risky, high-cost loans, pursuant to the Company's

11   commission structure.  Such compensation schemes constituted a violation of the confidential trust

12   relationships that were established between loan brokers, Countrywide representatives, and

13   borrowers.

14   75.   Even when the Plaintiff qualified for a prime loan, Countrywide improperly

15   incentivizesd and encouraged its brokers, through financial incentives, to move him into the

16   subprime category, for great profit and to the destruction of the Plaintiff's interest in all of his

17   remaining wealth. For example, the commission on a subprime loan was .50% of the loan's value,

18   while the commission on loans in the next highest category was a mere .20% of the loan's value.

19   This commission structure encouraged brokers to establish and breach fiduciary duties with their

20   customers, who were situated as the Plaintiff was situated.  The plaintiff, himself, experienced

21   precisely this sort of harm.

22   76.   In addition, mortgage brokers' commissions would vary on loans on which the

23   interest rate would increase after a short period with a low teaser rate, however the higher the reset

24   interest rate, the greater the commission earned by the broker; such was the case here.

25   Homeowners, including the Plaintiff, were not informed that the higher interest rate would, within

26   a foreseeable period of time, create a periodic minimum loan payment that the Homeowner could

27   not realistically pay.  Said loans would recite a loan period -- such as 30 years -- whereas the plain

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

21

and simple fact known to Countrywide and not to the borrower, was that there was no realistic chance that the homeowner could sustain an obligation to complete the loan without defaulting.

77.     The addition of penalties to the terms of a loan was also strongly encouraged and incentivized by Countrywide. For example, on information and belief, adding a three-year prepayment penalty to a loan would generate an extra 1% of the loan's value in a commission to the salesperson. Nowhere was this disclosed to the Plaintiff.

78.     Moreover, if a broker convinced a borrower to add a home equity line of credit to their loan, the broker would earn an extra 0.25% commission. Said line of credit was pitched to borrowers situated like the plaintiff, as an assurance of liquidity even if the borrower declared bankruptcy before the completion of construction for his dream house. 49.          A broker's inducing borrowers to take out subprime loans was even rewarded in some instances by perks such as all-expense-paid trips to places like Las Vegas.   Said perks were undisclosed to borrowers, as would be required by 15 U.S.C. 1607.          -

79.     In addition to the foregoing, Countrywide utilized computer software which prevented sales representatives from inputting a borrower's cash reserves when calculating the type of loan the borrower is eligible for, which resulted in the sales representative pitching a higher cost loan. Countrywide utilized this software in order to increase its own profit on such loans, since the Plaintiff who has more assets would normally be able to obtain a lower interest rate on his loan.

80.     The OTC program, in particular, is a particularly lucrative scheme for Countrywide because it "traps" consumers by convincing them to invest in the program before the loan closes. In particular, in the Plaintiff's transaction, Countrywide's agent Magaldi, induced MacCarley to invest in the construction of a "Dream Home" by hiring contractors.  Magaldi, with knowledge, consent, and ratification from Countrywide's Kona branch, operated as Real Estate Agent, Construction Supervisor, Loan Broker, Countrywide Loan Solicitor, and real estate appraiser. Although Countywide's own internal handbook, stored on Lotus Notes and available to every underwriting employee barred such conflicts of interest among its agents, said "bar" was for show

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

22

only. In reality, there was an express understanding among the loan officers, loan underwriters, loan brokers, real estate agents, and real estate appraisers, and the senior management of Countrywide, including Angelo Mozilo, that said practices were not only "not" barred, but were rewarded with 3% of the loan proceeds paid to the broker (in this case Magaldi and his associate), and an additional 2% of the loan proceeds paid to the Kona Branch of Countrywide. Said remuneration was in the form of a "kickback" from concealed costs, paid from revenue generated by selling the prepayment penalty to a third party investor. Countrywide rewarded unethical loans, including this loan, by paying its Loan Officers and Loan Underwriters with commissions based upon a percentage of the loan proceeds. Said practice had the effect of tying the predominant product with tie-in products that the consumer had no idea that he was buying, and that provided no benefit to the consumer.

### d) Subprime Loans were More Lucrative to Countrywide than Prime Loans

81.     Subprime loans are significantly more profitable for Countrywide than higher-quality prime loans. As set forth in Countrywide's regulatory filings, the company's profit margin on its sales to investors of sub prime loans versus prime loans was 1.84% versus 1.07%, respectively. Two years earlier, in 2004, the profitability of sales of subprime mortgages versus prime mortgages was even greater, at a rate of 3.64% versus 0.93%, respectively.

82.     One reason subprime loans are more lucrative for Countrywide is that investors who bought publicly traded securities backed by mortgages were willing to pay more for loans with prepayment penalties and when interest rates were going to adjust to higher levels, because such pools of subprime loans appeared likely to generate a larger cash flow than prime loans that carried lower fixed rates. Countrywide knew, but did not disclose to borrowers or investors, alike, its actual knowledge that when a majority of its adjustable rate mortgages would adjust, that homeowners situated as the plaintiff was situated, would be unable to pay the payments, and would default upon their mortgage. Said practice was dishonest, deceitful, malicious, spiteful, and oppressive, to the plaintiff, the plaintiff's community, and the economy of the United States of America.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,         COMPLAINT                    CASE NO.:

23

83.     In addition to higher interest rates on subprime loans and the potential for greater profits in the secondary mortgage market, subprime loans are more profitable to Countrywide because of a number of undisclosed features built into the structure of such loans, such as penalties and fees.  Countrywide brokers, though selling loans that were intended to induce the borrowers to default, did not inform borrowers about the true costs that would be added when borrowers would default upon their home mortgages.  Plaintiff experienced this sort of harm as well.

84.     For example, when a borrower tries to reduce his or her debt on such loans, he or she must pay a large prepayment penalty. In 2007, Countrywide enjoyed $268 million in revenues from prepayment penalties.   In a loan broker's verbal disclosures to a borrower, he or she would never disclose prepayment penalties unless specifically asked by the borrower.

85.     Moreover, late charges imposed on borrowers who had trouble making their payments also provide significant revenues for Countrywide. Revenues from late charges totaled approximately $285 million in 2006. Clearly, these payments are used by Countrywide as a profit-center to increase its bottom line while causing its customers to pay increased and improper payments to it, as is the case here.

86.     Countrywide also makes money from inflated fees that are charged at the closings on loans. The Plaintiff paid fees for things such as flood and tax certifications, appraisals, and document preparation at rates that far exceed what other lenders charge. For example, Countrywide's credit checks cost twice what others charge, and Countrywide charges $26 for a flood certification, where others charge only $12 to $14. Countrywide charges as much as $100 just to e-mail documents and $45 for sending documents via Federal Express. Many of these fees go to Countrywide's loan closing services subsidiary, LandSafe, Inc.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### e) *Countrywide was Lending to Borrowers Who Could not Afford the Payments; making a loan into an illusory INVESTMENT rather than a vehicle for facilitating housing.*

87.     Countrywide has written policies providing that it will make loans to borrowers even where the monthly loan payment will leave very little disposable income for the borrower to live on.

88.     For example, one Countrywide manual stated that a borrower with a family of four may obtain a loan even if the monthly mortgage payment left the family with only $1000 to live on for the month. A single borrower could obtain a loan whose payment left him only $550 for food, clothing and other expenses for the entire month. Such an ongoing practice created an unreasonable risk of default and financial ruin for borrowers, who trusted Countrywide to enter into loans for their mutual best interests.

89.     An example of the kind of risky and inappropriate loans Countrywide offered is one of its most commonly issued products, something called an "Option Arm Loan" or a "'Pay Option ARM" which "offer" to permit borrowers to underpay the interest on their mortgage, setting them upon an inevitable collision course with foreclosure.  Said loans were represented to be "30-year" loans, though Countrywide, doing the plain math, actually knew that such borrowers would default within a year or two after passing the statute of limitations for Truth in Lending violations.

90.     Borrowers with bad credit can easily obtain an Option Arm Loan for as much as 45% of their gross annual income. The reasona why, is that Countrywide could benefit from acquiring said properties and selling them at beneficial prices. Risk of Default was not described on advertisements that buyers relied upon.

91.     Borrowers are given three monthly payment options under the Option Arm Loan arrangement: (1) they can make a minimum monthly payment, which is actually less than the amount of interest owed on the loan; (2) they can pay the interest due only; or (3) they can make a payment that encompassed both the interest due and a portion of the principal of the loan.

92.     Because they are paying less than the amount of interest they owed on their loans, borrowers who opt to make the minimum monthly payment actually see the amount of their loan

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                    CASE NO.:

25

increase over time, even though they are making monthly payments on the loan. Further, built into the Option Arm Loan is an obligation that, if the amount owed ever increases to an amount equaling 115% of the original loan amount, the entire amount outstanding becomes due immediately. Accordingly, many borrowers have defaulted on their Option Arm Loans.

93.     In addition to the foregoing, it was not until early this year that Countrywide discontinued offering "piggyback" loans, which called for no money down by the borrower, and discontinued offering loans greater than 95% of the appraised value of the home without proof of the borrower's income.

## f)   *COUNTRYWIDE WAS A COMPENDIUM OF CONSPIRACIES*

94.     Defendants, and each of them,  have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and co-conspiracy, which includes not only the Defendants CW,  but other Real Estate Agents, Escrow Officers,  and Mortgage Brokers as well.

95.     Each Defendant and all members of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of fraud to wrongfully obtain money from Plaintiff, and actually committed such acts.

96.     Indeed, for the fraudulent scheme described above to be successful, each Defendant and other members of the conspiracy had to agree to enact and utilize the same devices and fraudulent tactics against the Plaintiff.

97.     Numerous common facts and similar activities, which reflect the above reality and imply the existence of a conspiracy, exist among all of the Defendants and other members of the conspiracy, including: (a) statements made to Plaintiff by Countrywide's broker authorized by Countrywide to sell its loan products to the Plaintiff, that they will obtain the "best loan" for the Plaintiff, (b) the utilization of standardized sales manuals by Countrywide's brokers and other authorized brokers, (c) the utilization of a commission structure instituted by Countrywide for the

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                    COMPLAINT                    CASE NO.:

determination of rates of commissions paid to Countrywide's brokers and other authorized brokers which resulted in Plaintiff being driven to a subprime loan when he was qualified to receive a loan on better terms, (d) the inclusion by Countrywide brokers and authorized brokers of certain closing fees payable to Countrywide subsidiaries which were significantly higher than those charged by other companies, (e) Countrywide's failure to provide Form 1099s to the Internal Revenue Service for income paid to its authorized brokers, and (1) the utilization by Countrywide brokers and other authorized brokers of Countrywide's CLUES TM computer system, which is designed to allow the mortgage broker to submit loan information and receive a qualified underwriting decision within minutes.

98.     During the past ten years, the conspiracy was conducted through and implemented by Defendants and independent mortgage brokers authorized to sell Countrywide mortgage loans.

### g) *COUNTRYWIDE WAS A RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION, WHOSE PURPOSE WAS TO ENGAGE IN "HOME EQUITY FRAUD" BY FALSELY CONVINCING HOMEOWNERS THAT THEY WERE OPRERATING TO THE HOMEOWNERS' BENEFIT*

#### i)  **Despite legal independence between Countrywide and its many co-conspirators, there was one actual Enterprise**

99.     Plaintiff and Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

100.    Based upon Plaintiffs current knowledge, the following persons constitute a group of individuals associated in fact that will (hereinafter referred to herein as the "Countrywide Enterprise"): (1) Countrywide and (2) other mortgage brokers not named as defendants herein who sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide.

101.    The Countrywide Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                      CASE NO.:

27

102.   While all Defendants participate in and are members and part of the Countrywide Enterprise, they also have an existence separate and distinct from the enterprise.

103.   In order to successfully induce and direct as many borrowers as possible into inappropriate sub-prime loans, Defendants need a system that allows them to effectively promote these loans. The Countrywide Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme.

104.   The Defendants control and operate the Countrywide Enterprise as follows: (a) Defendants issue the standardized sales manual to be followed by all Countrywide brokers, including the broker herein, and authorized brokers when soliciting a borrower to obtain a Countrywide mortgage loans, (b) Defendants determine the commission structure to be paid to all Countywide brokers and authorized brokers, rewarding and incentivizeing them to offer borrowers loans with less favorable terms than they would otherwise qualify for, (c) Defendants provide Countrywide brokers and authorized brokers access to its CLUES TM system, which was utilized to steer borrowers to more costly loans, and (d) Defendants encourage Countrywide brokers and authorized brokers to utilize Countrywide's subsidiaries for certain closing costs associated with the loan.

105.   The Countrywide Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

## ii) PREDICATE ACTS

106.   Section 1961 (1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud). As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

107.   In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

28

As a result, their conduct is indictable under 18 U.S.C. §1341 and 18 U.S.C. §1343, on this additional basis.

### iii) VIOLATIONS OF 18 U.S.C. §1341 and 18 U.S.C. §1343

108.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to promotional materials, applications, agreements, manuals, and correspondence.

109.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things, including but not limited to promotional materials, applications, agreements, federal and state disclosures, manuals, and correspondence, and made or caused to be made false statements over the telephone, electronic mail, and Internet.

110.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: promotional materials, applications, agreements, federal and state disclosures, manuals, correspondence, progress reports, loan application disclosures.

111.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                    CASE NO.:

29

112.   Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff in obtaining their property for Defendants' gain.

113.   Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiff relied upon the misrepresentations and omissions as set forth above.

114.   As a result, Defendants have obtained money and property belonging to the Plaintiff and Plaintiff has been injured in his business or property by the Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each-other's acts of mail and wire fraud.

115.   Although some courts have held that a private action does not to stand to justify a predicate act RICO for Wire Fraud and Mail Fraud, alone, a customer has a right to believe, when receiving inducements by mail and by telephone from a Nationwide Organization such as Countrywide, that such representations are true.  The use of Interstate telephone service and Interstate Mail, only served to convince the Plaintiff (and others similarly situated) that Countrywide and its agents were acting in his interest when, in fact, they were acting *against* his interests.  Plain old *actual* fraud suffices as well, and is aggravated by use of interstate telephone calls and postal service.


### iv) PATTERN OF RACKETEERING ACTIVITY

116.   have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, within the past ten years. In fact, each of the Defendants has committed or aided and abetted in the commission of thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                CASE NO.:

30

117.   The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## v) RACKETEERING VIOLATIONS

118.   Section 1962(a) of RICO provides that "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... in which such person has participated as a principal within the meaning of §2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."

119.   As set forth above, Defendants receive income from their participation as principals in an extensive pattern of racketeering activity.

120.   That income is reinvested to finance future racketeering activity, and the future operation of the Countrywide Enterprise.

121.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..."

122.   Through the patterns' of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the Countrywide Enterprise.

123.   Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section.

124.   Defendants' conspiracy to secure money from Plaintiff for their own use through the fraudulent scheme described above violates 18 U.S.C. §1962(d).

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7800
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

31

Case 1:10-cv-00431-JMS-KSC   Document 1   Filed 06/29/09   Page 32 of 48   PageID #: 32

130.   On or about April 22, 2008 the Plaintiff closed on the mortgage complained of herein.

131.   On or about April 22nd, 2008 the loan in question, closed and there were Brokers fees, discount points and other charges the Plaintiff was unaware of. The Plaintiff did not receive a Hud-1 Settlement Statement. The Brokers fees were not disclosed 3 days of giving application or at least 3 days before the closing.

132.   The Plaintiff received all preliminary disclosures required by the Truth in Lending Act (TILA) and the Real Estate Settlement Procedures Act (RESPA) on the day of closing, with exception to a Good Faith Estimate, which was never given.

133.   There were charges within the preliminary disclosures the Defendants charged that were not given in the required pre-disclosures known as a Good Faith Estimate (GFE) or Itemization of Amount Financed (IOAF).

134.   The fees charged are known as Discount Points and other fee

135.   On or about April 22nd, 2008, the broker received a commission as a value of the loan that went completely un-disclosed.

136.   Countrywide actually knew that the Loan Solicitor, Magaldi, was the same person who operated as the REAL ESTATE AGENT for the real estate purchase transaction. Noticing that the transaction was unethical, Countrywide management swapped the recipient of loan broker commissions to Magaldi's partner, subject to a deal that she would share the proceeds with Magaldi. But Magaldi himself actually brokered both the loan and the real estate.

137.   The loan Broker gave no Broker Contract or pre-disclosure of the fees before the transaction closing occurred. The fees have stripped the Plaintiff of equity by up selling the interest rate payable to Countrywide. Nothing disclosed to the borrower informed him that the loan broker was changed at the time of closing.

138.   .        At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                          CASE NO.:

33

agreement, is payable in more than four installments, and is the person to whom the transaction, which is the subject of this action was initially payable, making Defendants creditors within the meaning of TIL, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

139.   On or about April 22nd, 2008 ("settlement date"), Plaintiff executed a promissory note and a security agreement in favor of Defendants, ("the transactions"). The transactions extended consumer credit which was subject to a finance charge and which was initially payable to Defendants. The transaction is designated by **Defendants as loan # 180805561**.

140.   As part of this consumer credit transaction, Defendants retained a security interest in the Plaintiff's home, which was to be used as Plaintiff's principal dwelling.

141.   Before the settlement date, Defendants did not provide to Plaintiff the preliminary disclosures required by Truth in Lending Act (TILA) at 12 CFR 226.17 and 18, or any other preliminary disclosures as required by RESPA at 12 USC §2602(c) and (d), which is commonly known as the Good Faith Estimate and Adjustable Rate Mortgage Program Booklet. Said nondisclosure was deliberate, and was a standard operating practice for Countrywide and its agents for the course of over one year.

142.   Either before, during and/or after the settlement date, Defendants failed and/or refused to provide Plaintiff with true and accurate copies of important loan initiation documents, including but not limited to, copies of a Broker Contract, GFE or IOAF, and an accurate TILA disclosure.

143.   Defendants intentionally failed and/or refused to provide Plaintiff with various disclosures that would indicate to Plaintiff that the contract entered into is void, illegal and predatory in nature, such as an accurate Truth in Lending Disclosure (TIL) for the primary loan as required by 12 CFR §226.17 and 18 and no TIL for the secondary loan.

144.   The TILA given at the closing was inaccurate in that the APR was understated by 0.4776% and the Amount Financed was understated by $1219.83.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,              COMPLAINT                    CASE NO.:

34

145.    The Plaintiff was not given the Good Faith Estimate ("GFE") or Itemization of Amount Financed ("IOAF") before loan closing, which would have disclosed the cost of the loan, it would have reflected weather or not a Yield Spread Premium (YSP), discount points and other fees were going to be charged as required by the TILA at 12 CFR §226.4(a). These required disclosures would have disclosed the same and/or the true cost of the loan, if either were given and would have given a choice to the Plaintiff of whether to shop else where.

146.    Defendants were under legal obligation as a fiduciary and had the responsibility of over seeing the purported loan consummation and to assure that Plaintiff's consummation was right and that the Plaintiff received all mandated documentation and material disclosures under TILA and RESPA, before, during and after the transaction.  Plaintiff relied upon Defendant's claims that Defendants knew the best way to structure the transaction and would help Plaintiff make the best consumer transaction possible.  Plaintiff developed a confidential relationship with Defendant MAGALDI, through meeting with him privately in Los Angeles at Plaintiffs home and meeting with MAGALDI over dinner, thereby establishing a confidential relationship of trust.

147.    Defendants established a pattern and practice of defrauding Plaintiff in that, during the entire life of the loan, **they did not** correctly credit payments, calculate interest on the account due to the undisclosed fees and the ramifications thereof.  Defendants knew that the account was not accurate and that Plaintiff would make further payments based on the account.  Plaintiff did make payments based on the account and paid too much interest as a result.  In addition, Defendants used the inaccurate accounts to determine the amounts due at default and foreclosure.

148.    Plaintiff sent a Defendant Countrywide a rescission letter, demanding to rescind the loan pursuant to 12 CFR 226.23 and its antecedents. Defendants failed to respond.  Accordeingly, by operation of law, they apparently intend to waive their security interest in the subject property.

---

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,              COMPLAINT                      CASE NO.:

6)     **COUNT I**

i) *RACKETEERING - 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(A) AND (C); AGAINST ALL DEFENDANTS*

149.    Plaintiff restates and realleges paragraphs 1 through 116, inclusive, of the complaint on file herein, and incorporates the same herein by reference as though fully set forth.

150.    This claim for relief arises under 18 U.S.C. § 1964(c).

151.    In violation of 18 U.S.C. §1962(d), Defendants have, as set forth above, conspired to violate: 18 U.S.C. §1962(a) by using and investing income received from a pattern of racketeering, directly or indirectly, to establish and operate the Countrywide Enterprise, which is engaged in, and whose activities affect, interstate commerce; and 18 U.S.C. §1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Countrywide Enterprise through a pattern of racketeering. As a direct and proximate result, Plaintiff has been injured in his business or property by both the predicate acts which make up the Defendants' patterns of racketeering and their investment and reinvestment of income there from to operate, expand and perpetuate the Countrywide Enterprise.

152.    Specifically, Plaintiff has been injured in his business or property because borrowers who are induced into taking out sub-prime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of having to pay much higher interest rates than they would otherwise pay on such loans. Borrowers who enter into loans for which they are not qualified and which they cannot afford, which are offered with the promise that such loans will improve their financial well-being, have been injured through the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to defaults on their loans, losses of their homes, destruction of their credit, bankruptcy, or financial ruin.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,     COMPLAINT     CASE NO.:

36

1   7)      **COUNT II**

2

3   i)   **CIVIL CONSPIRACY IN THE VIOLATION OF 18 U.S.C. § 1962(A)
       AND (C); AGAINST ALL DEFENDANTS**

4   153.    Plaintiff restates and realleges paragraphs 1 through 120, inclusive, of the

5   complaint on file herein, and incorporates the same herein by reference as though fully set forth.

6   154.    This claim arises under 18 U.S.C. § 1964(c).118.As set forth above, Defendants

7   knowingly, and with shared intent, sought to, and have, aided and abetted each of the other

8   Defendants in the commission of predicate acts, in engaging in a pattern of racketeering activity,

9   and in violation of 18 U.S.C. § 1962(a) and (c) as described in paragraphs 306-310 and 335 above.

10   155.    As a result, under 18 US.C. §2, the RICO violations of each Defendant are those of

11   the others as if they had been committed directly by them.

12   156.    As a direct and proximate result of the fact that each Defendant aided and abetted

13   the others in violating 18 U.S.C. §1962 (a) and (c), Plaintiff has been injured in his business or

14   property by both the predicate acts which make up the Defendants' patterns of racketeering and

15   their investment and reinvestment of income therefrom to operate, expand and perpetuate the

16   Countywide Enterprise.

17   157.    Specifically, Plaintiff has been injured in his business or property because

18   borrowers who are induced into taking out sub-prime loans when they are actually qualified for

19   loans on better terms, such as prime mortgages, suffer losses to their property in the form of

20   having to pay much higher interest rates than they would otherwise pay on such loans. Borrowers

21   who enter into loans for which they are not qualified and which they cannot afford, which are

22   offered with the promise that such loans will improve their financial well-being, have been injured

23   through the destructive impact on their financial well-being of having to make monthly payments

24   they cannot afford, sometimes leading to defaults on their loans, losses of their homes, destruction

25   of their credit, bankruptcy, or financial ruin.

26

27

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                    CASE NO.:

**8) COUNT III**

*j) AIDING AND ABETTING; ACTIONS VIOLATING THE RICO ACT 18 U.S.C. § 1962(A) AND (C)*

158. Plaintiff restates and realleges paragraphs 1 through 156 above by reference as though fully set forth herein.

159. This claim for relief arises under 18 U.S.C. § 1964(c).

160. As set forth above, Defendants have violated 18 U.S.C. §1962 (a) by using and investing income received from a pattern of racketeering, directly or indirectly, to establish and operate the Countrywide Enterprise, which is engaged in, and whose activities affect, interstate commerce, and have violated 18 D.S.C. § 14 1962 (c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Countrywide Enterprise through a pattern of racketeering.

161. As a direct and proximate result, Plaintiff has been injured in his business or property by both the predicate acts which make up the Defendants' patterns of racketeering activity and their investment and reinvestment of income therefrom to operate, expand and perpetuate the Countrywide Enterprise.

162. Said conspiracy benefitted the Countrywide Enterprise by creating a salesworthy investment in a future real estate foreclosure, rather than an investment in proceeds from a legitimate real estate collateralized loan, as was represented to the Plaintiff and others similarly situated. Said right to foreclose, was rapidly sold to investors on a secondary market, to minimize Countrywide's apparent exposure as a lender, to borrower claims.

163. Specifically, Plaintiff has been injured in his business or property because borrowers who are induced into taking out sub-prime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of having to pay much higher interest rates than they would otherwise pay on such loans. Borrowers who enter into loans for which they are not qualified and which they cannot afford, which are

MACCARLEY v. COUNTRYWIDE, et al.,      COMPLAINT      CASE NO.:

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (509) 481-1561

38

offered with the promise that such loans will improve their financial well-being, have been injured through the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to defaults on their loans, losses of their homes, destruction of their credit, bankruptcy, or financial ruin, as occurred to the Plaintiff.

9)   **COUNT IV**

k) *DECLARATORY AND INJUNCTIVE RELIEF UNDER 18 U.S.C. §1964(A) AGAINST BANK OF AMERICA AND LANDSAFE*

164.   Plaintiff restates and realleges paragraphs 1 through 130, inclusive, of the complaint on file herein, and incorporates the same herein by reference as though fully set forth.

165.   This claim arises under 18 U.S.C. §1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201 which authorizes associated declaratory relief.

166.   Defendants have violated 18 U.S.C. §§1962(a), (c) and (d), and will continue to do so in the future.

167.   Defendants have participated in a willful scheme of manipulating the price of real estate to their advantage, and at substantial cost to out-of-state borrowers.

168.   Landsafe received loan charges set forth upon Plaintiff's HUD-1 settlement statement for the loans depicted in paragraph 139 on page 34, above, but actually did not perform the work.

169.   Defendants have participated in the process of using residential mortgage loans as an opportunity to invest in real estate.

170.   Defendants have participated in the process of paying Appraisers according to the results of their appraiser, rather than for their time, skill, and ethics.

MACCARLEY v. COUNTRYWIDE, et al.,           COMPLAINT                    CASE NO.:

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

39

171.   Defendants have participated in creating an illegal combination of individuals and firms with common incentives to committing bait-and-switch fraud when selling residential mortgages.

172.   Enjoining the Defendants from committing these acts in the future and/or declaring their invalidity is appropriate, since the Plaintiff has no adequate remedy at law, and will, as set forth above, suffer irreparable harm in the absence of declaratory and permanent injunctive relief, which is binding upon them and their successors.

## 10)   COUNT V

### l) *VIOLATION OF THE CALIFORNIA UCL-BUSINESS & PROFESSIONS CODE §17200, ET SEQ.*

173.   Plaintiff restates and realleges paragraphs 1 through 134, inclusive, of the complaint on file herein, and incorporates the same herein by reference as though fully set forth.

174.   Defendant advertised low price loans when actually marketing high priced loans, whose true costs were not disclosed. Its agents perpetuated this misrepresentation by understating the true costs of loans throughout the transaction, even up to the time of closing. Said practices were intended to deceive the public, including this plaintiff.

175.   Defendants' conspiracy included making false and increasingly misleading representations to borrowers, developing and capitalizing upon such confidential relationships that arose in California, and, then switching to incomprehensible out-of-state loan contracts, all of which constitute unlawful, unfair and fraudulent business practices under the UCL, California Business and Professions Code 17200.

176.   Specifically, Plaintiff has been injured in his business or property because borrowers who are induced into taking out sub-prime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

40

having to pay much higher interest rates than they would otherwise pay on such loans. Borrowers who enter into loans for which they are not qualified and which they cannot afford, which are offered with the promise that such loans will improve their financial well-being, have been injured through the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to defaults on their loans, losses of their homes, destruction of their credit, bankruptcy, or financial ruin.

177.    Plaintiff's claims involve questions of common and general interest as provided under Cal. Code. Civ. P. § 382.

178.    The Defendants' advertisement and inducements through Joe Magaldi III were a direct, foreseeable, and proximate cause of the Plaintiff's entrustment of the Defendants with over $60,000 (by one computation) and over $101,000 (by a different computation); though said entrustment was based upon false pretenses.

179.    Plaintiff has suffered losses of money as a result of Defendants' unlawful, deceptive and unfair business practices. As a result of Defendants' violations of the UCL, Plaintiff and members of the Class named in this Count are entitled to bring this claim for disgorgement and to recover restitution, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.


## 11)    COUNT VI

### m) VIOLATION OF THE CALIFORNIA FAL, BUSINESS AND PROFESSIONS CODE §17500, ET SEQ

180.    Plaintiff restates and realleges paragraphs 1 through 139, inclusive, of the complaint on file herein, and incorporates the same herein by reference as though fully set forth.

181.    Defendants violated California's false advertising laws because their scheme involved deceptive, untrue and misleading advertising.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

41

182.   Specifically, Plaintiff has been injured in his business or property because borrowers who are induced into taking out sub-prime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of having to pay much higher interest rates than he would otherwise pay on such loans. Borrowers who enter into loans for which they are not qualified and which they cannot afford, which are offered with the promise that such loans will improve their financial well-being, have been injured through the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to defaults on their loans, losses of their homes, destruction of their credit, bankruptcy, or financial ruin.

183.   Defendants should be ordered to disgorge and make restitution to Plaintiff and Class members of the excessive payments and profits obtained at their expense.

## 12)   COUNT VII

### n)  UNJUST ENRICHMENT

184.   Plaintiff restates and realleges paragraphs 1 through 143 inclusive, of the complaint on file herein, and incorporates the same herein by reference as though fully set forth.

185.   Defendants' deceptive artifice unjustly enriched Defendants, to the detriment of the Plaintiff, by causing Defendants to receive excessive monetary payments from Plaintiff.

186.   Specifically, Plaintiff has been injured in his business or property because borrowers who are induced into taking out sub-prime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of having to pay much higher interest rates than he would otherwise pay on such loans. Borrowers who enter into loans for which they are not qualified and which they cannot afford, which are offered with the promise that such loans will improve their financial well-being, have been injured through the destructive impact on their financial well-being of having to make monthly payments

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

they cannot afford, sometimes leading to defaults on their loans, losses of their homes, destruction of their credit, bankruptcy, or financial ruin.

187.    Defendants' retention of funds paid by Plaintiff violates the fundamental principles of justice, equity, and good conscience.

188.    Accordingly, Defendants should be ordered to return any funds obtained as a result of their deceptive scheme to the Plaintiff.

## 13)    COUNT VIII

### o) *VIOLATION OF THE TRUTH IN LENDING ACT AND FOR RECUOPEMENT AGAINST ALL DEFENDANTS*

189.    Plaintiff restates and realleges paragraphs 1 through 43, inclusive, of the complaint on file herein, as though fully set forth herein.

190.    The Plaintiff is a consumer and the Defendants sold Consumer Mortgage loan products to the Plaintiff, which loans are both subject to the TILA.

191.    Defendant has committed fraud in the initiation loans, notes and mortgages. Exposition of the fraud has required Congressional Hearings and other Legislative investigations to ascertain. Therefore, to the extent that the discovery of the full extent of the Defendants' frauds has been concealed from this Plaintiff, Equitable tolling is demanded; furthermore Plaintiff has the right to recouopement pursuant to 15 USC §1640(e).

192.    All of the Defendants, and each of them,  have engaged in a pattern of unfair practices in violation of the Truth in Lending Act ("TILA"), 15 USC §1601 et seq., 15 USC §1635(a), (b) and (g), in that, an inaccurate TILA disclosure was given to Plaintiff, beyond the tolerances of Regulation Z. Accurate disclosure must be given as required by Regulation Z at 12 CFR 226.17 and 18.

193.    The violations entitle Plaintiff to damages under 15 USC §1640(a) et seq., of actual damages, twice the finance charge and reasonable attorney fees and costs pursuant to statute. The Material disclosures violations are as follows:

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

43

**14)      COUNT IX**

*p) HAWAII CONSUMER PROTECTION HRS 476-2 AGAINST ALL DEFENDANTS*

199.    Plaintiff restates and realleges paragraphs 1 through 198, inclusive, of the complaint on file herein, as though fully set forth herein.

200.    A violation of the federal laws set forth above is also a violation of the Hawaii consumer protection statues, HRS §476-2 entitling the Plaintiff to damages according to statue.

**15)      COUNT X**

*q) APPRAISAL FRAUD, ANTITRUST AND FRAUD AGAINST ALL DEFENDANTS*

201.    Plaintiff restates and realleges paragraphs 1 through 158, inclusive, of the complaint on file herein, and incorporates the same herein by reference as though fully set forth.

202.    Defendants use appraisals that work to get the loan through Countrywide's underwriting system of approval with disregard to the true appraisal of the Plaintiff's property.

203.    On or about November 1", 2005 Plaintiff contacted Magaldi seeking professional advice about property in Hawaii. Magaldi represented to the Plaintiff that he was a real estate agent and loan broker.

204.    On or about July 6, 2006, Magaldi and Defendant Countrywide represented to Plaintiff that the property appraisal was $1,150,000.00.

205.    For example, on or about, July 6, 2006, Landsafe appraised this Plaintiffs property at $1,150,000.00, when a more accurate appraisal of the Plaintiff's property at the time, is $700,000.00.   No reasonable appraiser, at the time, could have appraised the subject property for $1,150,000.00. Defendants capitalized upon their inducement of an out-of-state borrower, who lacked familiarity with real estate prices in the vicinity of his "Dream Home."   Defendants fraudulently manipulated the real estate price by hiring only appraisers who were willing to state

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                CASE NO.:

45

1   higher and higher prices, and refusing to pay appraisers who stated "honest" prices. Defendants,

2   and lenders, selected the comparable to be evaluated in the process of appaising properties. The

3   particular appraiser used for the subject property had been a close friend of Magaldi since

4   childhood, and followed his instructions for appraising a property withing his desired price range,

5   to justify loans with high commissions. Countrywide used and approved the use of Landsafe Title

6   Company, a firm that routinely appraises real estate, though owned and controlled by

7   Countrywide. Accordingly it was Countrywide's established and illegal policy to make loans

8   without appraiser independence.

9        206.   On or about April 22nd, 2008, Countrywide closed a loan with Plaintiff based upon

10  the appraisal of $1,150,000.00. Said loan incurred fees to the Plaintiff as a percentage of the

11  appraisal price, inducing Plaintiff to contribute a downpayment, pay certain fees, and then make

12  payments, without realizing that all of it would be lost and could not be recovered.

13       207.   Within the Ancillary or Pendent jurisdiction of the Federal Court, said actions

14  constitute plain old fraud in the inducement to enter into a contract, and establish the existence of a

15  state law cause of action called "Appraisal Fraud."

16       208.   Howver, such appraisal fraud was conducted using a method of selecting appraisers

17  that violated norms of independence between appraisers, real estate agents, loan solicitors.

18       209.   Magaldi was the real estate agent, the loan solicitor, a top performer at a Kona

19  branch of Countrywide, construction supervisor, dual fiduciary for both the borrower *and* the

20  lender (by virtue of his confidential relationships with both, and dual fiduciary for both the lender

21  *and* the appraiser (having confidential relationships with both). The lead manager at Countrywide

22  Honolulu "Super-Branch"  had knowledge of Magaldi's dual relationship statuses, approved of the

23  relationships, and failed to sever relationships with Magaldi because Magaldi was profitable.

24       210.   Countrywide owned LandSafe (a combination of interrelated companies), the

25  company that took responsibility for the appriaser who stated the value of the property.

26       211.   The dual relationship between Countrywide and Landsafe made it impossible for

27  LandSafe to conduct *independent* real estate appraisals.

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                CASE NO.:

46

212.    LandSafe operated as Countrywide's agent for purposes of *maximizing* the stated value of real estate collateral.

213.    Countrywide had an established practice of not paying Real Estate Appraisers who appraised property at prices not deemed adequate.

214.    Countrywide had an established list of Real Estate Appraisers whom it knew to provide suitable real estate appraisals at increasingly higher prices, which were higher than fair market value.

215.    By virtue of Magaldi's specific representations to the Plaintiff, the Plaintiff trusted the Appraiser to state the true value of the subject property within reasonable tolerances.

216.    Magaldi, himself, selected the "comp" properties to be compared to the Plaintiff's property; both on the specific occasion of the Plaintiff's acquisition and also on many occasions between January 1, 2005 and December 31, 2007.

217.    The practice of deliberately overstating real estate values constituted a conspiracy in violation of the Sherman Anti-Trust Act. 26 Stat. 209, 15 U.S.C. § 1, since one higher than truthful appraisal led to another, and to yet another, until the Plaintiff's appraisal was a full $410,000 higher than its highest realistic value even at the peak of the real estate market; for a sale of Hawaii real estate to a California Resident.

218.    Countrywide and Landsafe's practice of refusing to pay undesirable appraisers, selecting "inside" appraisers, and routinely overstating the value of property to the Plaintiff, was fraudulent and oppressive, within the meaning of California Civil Code 3294 and related Federal and state authorites.

219.    Said practice of manipulating the stated price of real estate, and this particular incident, damaged the Plaintiff by no less than $1,150,000 and $700,000 -- or $410,000. Treble damages are $1,230,000; which are hereby demanded from each Defendant.

220.    Since this Count also defines a count of "plain old fraud", Plaintiff furthermore demands Punitive Damages to be measured by a reasonable proportion of the compensation paid

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

47

**17)    Count XII**

*s) Collection of an Unlawful Debt Against all Defendants*

226.    Plaintiff repeats each of the prior paragraphs as if fully set forth herein.

227.    The debt established by the subject loans was unlawful, within the meaning of 18 U.S.C.A. § 2, made in an interstate enterprise as meant by 18 U.S.C. 1962(a), and established throught the control of an affiliated enterprise through the esablishment and collection of an unlawful debt, per 18 U.S.C. 1862(b).

228.    The overall conspiracy, involving the combination of Countrywide companies, Landsafe Companies, Joe Magaldi III and his companies, establishes an Interstate Enterprise by virtue of constituting a Union or Group individuals associated in fact though not a legal entity, within the meaning of 18 U.S.C.A. § 1961(4).

229.    Plaintiff is entitled to an order enjoining the Defendants from collecting or benefitting from the debt obligations represented by the subject loans.

**18)    PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands entry of a Judgment against Defendants as follows:

1) A declaration that Defendants have committed the violations alleged herein;

2) An award of treble the amount of damages suffered by Plaintiff as proven at trial, plus interest at the legal rate, and attorneys' fees and expenses pursuant to 18 U.S.C. §1962(c) and (d);

3) An award of Exemplary Damages against all Defendants;

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT          CASE NO.:

49

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4)  An Order to Defendants and each of the persons who realized personal benefit from their transactions, to disgorge the payments and profits they wrongfully obtained at the expense of Plaintiff;

5)  An Order that restitution be made to Plaintiff for Defendants unjust enrichment;

6)  An Order that an accounting be made by Defendants of their wrongfully obtained payments and profits;

7)  An Injunctive Order preventing Defendants from engaging in future fraudulent practices;

8)  An Order that restitution be made to Plaintiff for Defendants TILA violations allowed by 15 U.S.C. §1640(a);

9)  An Injunctive Order enjoining the Defendants and their agents from foreclosing upon the subject property before a Final Judgment is obtained

10) An Order that restitution be made to Plaintiff for Defendants second violation under the TILA and granting a second damage therefrom;

11) An Order that restitution be made to Plaintiff for Defendants appraisal fraud in the amount of the appraisal, within the joint and several responsibility of all Defendants

12) As to All Causes of Action, costs of suit herein;

13) As to all Causes of Action, reasonable attorneys fees; and;

14) Any such other and further relief as this Court deems just and proper.

## 19)   RIGHT TO AMEND

Plaintiff reserves the right to amend this Complaint, asserting other facts and causes of action after further investigation and discovery.

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,                COMPLAINT                    CASE NO.:

1  **20)    JURY DEMAND**

2      Plaintiff demands a trial by jury on all claims so triable as a matter of right.  Plaintiff asks

3  the court to make all such orders that are necessary to preserve its jurisdiction over the subject

4  claims.

5

6  **21)    CERTIFICATION OF COUNSEL**

7      I am Stephen I. Gassner, attorney for the Plaintiff.  I have reviewed the complaint and

   know its contents.  I have personally reviewed and investigated many of the allegations therein,

8  ascertained that there exists sufficient evidence to believe that upon completion of formal

9  discovery, there will be sufficient evidence to prove all claims set forth herein.

10

11  DATED: June 29, 2009                    Respectfully Submitted,

12
                                         GASSNER & GASSNER, APC   -      .
13
                                         By:_____
14                                           STEPHEN I. GASSNER, Attorney For Plaintiff,
15                                           KURT MACCARLEY

16                                       GASSNER & GASSNER, APC
                                         9121 Haven Avenue, Suite 260
17                                       Rancho Cucamonga, California  91730
                                         Telephone: (909) 937-7000
18                                       Facsimile: (909) 481-1561

19  **22)    Verification**

20      I am KURT MACCARLEY, Plaintiff herein.  I have read the foregoing Complaint and

21  have knowledge of its contents.  I declare under penalty of perjury that the foregoing is true and

22  correct.  This declaration was signed under penalty perjury under the laws of the State of

23  California, and executed at _Los Angeles_, California.

24

25  DATED: June 25, 2009                    _____
                                            KURT MACCARLEY, Plaintiff
26

27

28

Gassner & Gassner
9121 Haven Ave. #260
Rancho Cucamonga,
CA 91730
T: (909) 937-7000
F: (909) 481-1561

MACCARLEY v. COUNTRYWIDE, et al.,          COMPLAINT                    CASE NO.: